FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 30 2011

at 6 o'clock and 35 min. P. M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re: | ) | CIVIL NO. 11-00349 SOM-BMK |
| | ) | |
| JAMES WILLIAM LULL, | ) | (Bankr. Case No. 06-00898) |
| | ) | |
| Debtor, | ) | |
| | ) | |
| _____ | ) | Adversary No. 10-90084 |
| | ) | |
| RONALD KOTOSHIRODO, | ) | |
| Chapter 7 Trustee, | ) | ORDER REVERSING BANKRUPTCY |
| | ) | COURT'S PARTIAL SUMMARY |
| Appellant, | ) | JUDGMENT IN FAVOR OF TRUSTEE |
| | ) | AND FINAL JUDGMENT IN FAVOR |
| vs. | ) | OF TRUSTEE, AND REMANDING |
| | ) | CASE |
| WILLIAM F. BRENNAN, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

ORDER REVERSING BANKRUPTCY COURT'S PARTIAL
SUMMARY JUDGMENT IN FAVOR OF TRUSTEE AND FINAL
JUDGMENT IN FAVOR OF TRUSTEE, AND REMANDING CASE

I.      INTRODUCTION.

        Before the court is an appeal from a judgment entered

by the United States Bankruptcy Court for the District of Hawaii

("Bankruptcy Court").  The question on appeal is whether

Appellant William F. Brennan ("Brennan") had an "insider"

relationship with Debtor James Lull ("Lull") such that Appellee

Ronald Kotoshirodo, United States Trustee ("Trustee"), may

recover, as avoidable preferences, funds transferred to Brennan.

A determination that a person or entity has "insider" status

allows recovery from that insider of funds preferentially

transferred up to a year before the filing of a bankruptcy

1

petition. Absent "insider" status, such recovery is typically limited to transfers made within 90 days of the filing of the bankruptcy petition. The transfers in issue on this appeal (totaling $371,500.00 plus a mineral collection) occurred nearly nine months before Lull filed his bankruptcy petition.

The Bankruptcy Court granted summary judgment to the Trustee, ruling that Brennan was indeed an insider. This court REVERSES the Bankruptcy Court's ruling, concluding that the Trustee does not meet his burden of establishing that Brennan was an insider. The court REMANDS the case to the Bankruptcy Court for further proceedings.

II.      FACTUAL BACKGROUND.

The United States Bankruptcy Court's Findings of Fact and Conclusions of Law, filed on April 26, 2011 in Bk. No. 06-00898, Adv. No. 10-30084, set forth the basic facts of this case. See Findings of Fact and Conclusion of Law, Apr. 21, 2011, Adv. No. 10-90084, ECF No. 65; In re James William Lull (Kotoshirodo v. Brennan), Bk. No. 06-00898, Adv. No. 10-90084, 2011 WL 1587359 (Bankr. D. Haw. Apr. 26, 2011). To the extent those facts are undisputed, the court here incorporates that statement of facts, supplementing it as appropriate.

Lull was charged with having run a Ponzi scheme in which victims lost millions of dollars. He pled guilty in 2008 to a federal charge of wire fraud, but died, in what appears to

2

have been a suicide, on May 14, 2009, the day he was to appear to be sentenced by this very district judge.  See Findings of Fact and Conclusion of Law 2, Adv. No. 10-90084, ECF No. 65; see also Docket Sheet in Crim. No. 08-00564SOM.  There is neither an allegation nor any evidence that Brennan engaged in any deceitful or illegal conduct or knowingly collaborated with Lull in fraudulent activities.

Lull had filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on December 8, 2006, and the Trustee was thereafter appointed.  Findings of Fact and Conclusions of Law 3, Adv. No. 10-90084, ECF No. 65.  On March 27, 2007, Brennan and his wife filed a proof of claim in the amount of $410,724.39, based on loans they had made to Lull.  Id. The Bankruptcy Court found that, in the year preceding the filing of Lull's bankruptcy petition, Lull had made transfers to, or for the benefit of, Brennan totaling $371,500.  Id. at 4.  The Bankruptcy Court's finding does not include any reference to Mrs. Brennan with respect to these transactions.  The Bankruptcy Court found that, within that same time period, Lull also transferred a mineral collection to Brennan.  Id.  Again, there is no mention of Mrs. Brennan in this finding.

At the time of the transfers to Brennan, Lull was an officer, director, and 50-percent owner of Kauai Lease and Loan, Inc. ("KLL"), which was the managing member and owner of more

than 20 percent of Kapaa 382 LLC ("K382 LLC"), a Hawaii limited
liability company.  Id.

The parties disagree as to the extent of Brennan's
connection to K382 LLC.  The documentary evidence on this point
consists of two purported agreements.

The first agreement, bearing the title "Subscription
Agreement," is not signed by either William Brennan or his wife,
Judith Brennan.  See Subscription Agreement (May 2, 2000),
attached as Exhibit "A" to Supp. Br. of Def. William F. Brennan
Regarding The Subscription Agreement And Joint Ownership
Interests, Adv. No. 10-90084, ECF No. 59-1.  Their names, without
any description, appear in handwriting on the "Name of
Subscriber" line, but nowhere else in the document.  Id. at 1.
The text of the Subscription Agreement repeatedly refers to "the
undersigned," stating, for example, that "the undersigned hereby
subscribes for and agrees to purchase" certain interests, that
"The undersigned understands that the Company [K382 LLC] is
relying upon the accuracy and completeness of this Subscription
Agreement" and that "The undersigned hereby indemnifies and holds
the Company . . . harmless."  See id. at 1-6.  Curiously, there
is not even a signature line for "the undersigned" subscriber!
The only signature is that of William Hancock, the President of
KLL, acknowledging the "Company's" acceptance of the subscription
on May 2, 2009.  Id. at 8.

The first page of the Subscription Agreement contains handwriting that fills in blanks and that notes changes with differing effective dates. Id. at 1. The President's (but not Brennan's) initials or signature accompanies the various edits. Id. The document states that $50,000 is the price of each "Membership Interest." Id. It appears that 8 interests were at one time to be purchased for $400,000.00, but the "8" was changed to "10," then to "15," and the price correspondingly changed to "$500,000.00," then to "$750,000.00." Id. The Company's acceptance of the subscription was not changed and reflects acceptance of a subscription for only 8 units.

The effect of the Subscription Agreement is unclear. Characterizing himself as a victim of Lull's schemes, Brennan says that, while he and his wife did pay for 15 units, they never actually received anything evidencing ownership. See Appellant's Opening Br. 17-18, ECF. No. 5. Apparently relying on a declaration by William Hancock stating that the Brennans owned 24.5 percent of K382 LLC and a corroborating statement by Brennan in a memorandum he filed ("There is evidence consistent with Defendant's understanding, that he and his wife each owned $12.25% individually"), the Bankruptcy Court found that each of the Brennans "owned a 12½% interest, so those 15 membership interests represented 25% of the voting securities of K382 LLC."

Findings of Fact and Conclusions of Law 4.[1]  (The Bankruptcy

Court's reference to 25 percent instead of 24.5 percent appears

to be an inadvertent error that does not affect this court's

analysis.)

In finding that the 24.5 percent interest that the

Brennan's had was "25% of the voting securities of K382 LLC," the

Bankruptcy Court may have been relying on K382 LLC's Amended and

Restated Operating Agreement or on the second critical document

in this appeal, a document with the simple title "Agreement."

See Agreement (Aug. 30, 2006), attached as Exhibit "1" to Pl.'s

Post-Hr'g Br. on the Extent of Def. William F. Brennan's

Ownership in K382, Adv. No. 10-90084, ECF. No. 60.  The Agreement

resolved claims by the Brennans against K382 LLC, effective

August 30, 2006, a little less than nine months before Lull filed

his bankruptcy petition.  In this document, K382 LLC agreed to

buy back the Brennans' shares in K382 LLC and to make periodic

---

[1] The Trustee takes the position that the statement in his
Concise Statement of Facts that "Brennan and his wife owned 24.5%
of K382" was uncontested by Brennan.  Answering Br. at 4, ECF No.
7.  This court disagrees.  Brennan's Response to Plaintiff's
Concise Statement of Facts expressly denied the Trustee's
assertion and referred to Brennan's declaration.  See Def.
William F. Breannan's Resp. to Pl.'s Concise Statement of Facts
3, Adv. No. 10-90084, ECF No. 32.  Brennan's declaration does
indeed state that the Brennans did not receive any membership
units in K382 LLC or incidents of membership such as K-1 forms.
See Decl. Of William F. Brennan ¶¶ 10-15, Adv. No. 10-90084, ECF
No. 31-3.  It also takes the position that, if Brennan and his
wife owned a 24.5 percent interest in K382 LLC, then Brennan
individually owned half, not all, of that.  Id. ¶ 15.

partial payments of the purchase price from the proceeds of the anticipated sale of certain condominium units. The document also stated that each "Remaining Member" of K382 LLC (i.e., members after the Brennans released their Membership Interests) was "entitled to that number of votes determined in accordance with that Remaining Member's percentage of shares in the company pursuant to Kapaa 382's Amended and Restated Operating Agreement." Id. at 5.

The Bankruptcy Court paid particular attention to the statement in the 2006 Agreement that "William F. Brennan and Judith E. Brennan are Class B members of Kapaa 382 and presently jointly own fifteen (15) Class B shares in Kapaa 382." Findings of Fact and Conclusions of Law 4-5, Adv. No. 10-90084, ECF No. 65. The nature of Brennan's membership and the manner in which he held the interests were vigorously contested by the parties in the Bankruptcy Court.

The Trustee's motion for summary judgment came before the Bankruptcy Court on January 20, 2011. Id. at 3. The Bankruptcy Court granted the motion as to all elements of avoidable preferences, except the question of whether Brennan was an "insider" as defined in 11 U.S.C. § 101(31). Id. See Order Granting in Part Pl.'s Mot. for Partial Summ. J. as to Def. William F. Brennan's Receipt of Preferences and for Subordination or Disallowance of Claim Filed Nov. 16, 2010, Adv. No. 10-90084,

ECF No. 43.

A hearing on the "insider" issue that the Bankruptcy Court had reserved was held on March 17, 2011. The Trustee argued, and the Bankruptcy Court agreed, that Brennan had an insider relationship with Lull, meaning that any transfer within a year of the filing of Lull's bankruptcy petition from Lull to Brennan could be avoided and recovered by the Trustee. Findings of Fact and Conclusions of Law 5-9, Adv. No. 10-90084, ECF No. 65. Specifically, the Bankruptcy Court constructed an "'insider' chain connecting Debtor to Defendant[,]" with KLL and K382 LLC as intermediate "links." Id. at 6-8. The Bankruptcy Court's reasoning can be summarized as follows:

(1) Lull, an individual, was the debtor;

(2) KLL is an "insider" with respect to Lull, who was a director, officer, and 50-percent shareholder in KLL. KLL is also an "affiliate" with respect to Lull, as Lull owned 50 percent of KLL's shares. As an affiliate, KLL is treated as if it were Lull;

(3) K382 LLC is an "affiliate" of KLL's, as KLL was K382 LLC's managing member and owned more than 20 percent of K382 LLC. Having affiliate status with KLL (Lull's affiliate) makes K382 LLC also Lull's affiliate, as a debtor's affiliate is treated as if it were the debtor.

(4) As an owner of 20 percent or more of K382 LLC

stock, Brennan is an affiliate of K382 LLC's.  As Lull's

affiliate, K382 LLC is treated as though it were Lull, meaning

that Brennan's affiliate status with K382 LLC makes Brennan an

affiliate/insider of Lull's.

Having concluded that Brennan was an insider of Lull's,

the Bankruptcy Court entered summary judgment and final judgment

in favor of the Trustee.  <u>See</u> Order Concerning Cross-Mot. for

Summ. J., Adv. No. 10-90084, ECF No. 66; Final J. Against Def.

William F. Brennan, Adv. No. 10-90084, ECF No. 67.  Brennan

timely appealed the Bankruptcy Court's  determination of his

insider status.  <u>See</u> Notice of Appeal, May 9, 2011, Adv. No. 10-

90084, ECF No. 73; Appellant's Opening Br., July 5, 2011, ECF No.

7.

III.    <u>STANDARD OF REVIEW.</u>

Although the determination of insider status is

generally a question of fact to be reviewed under the clearly

erroneous standard, <u>In re Friedman (Friedman v. Sheila Plotsky</u>

<u>Brokers, Inc.)</u>, 126 B.R. 63, 67 (B.A.P. 9th Cir. 1991), the

Bankruptcy Court ruled that Brennan was an insider as a matter of

law.  <u>See In re Schuman (Miller v. Schuman)</u>, 81 B.R. 583, 586

n.1 (B.A.P. 9th Cir. 1987) (to the extent that underlying facts

are undisputed, the insider determination may be a mixed question

of law and fact).  This court reviews the Bankruptcy Court's

findings of fact for clear error and its conclusions of law de

novo. <u>In re Kimura (United States v. Battley)</u>, 969 F.2d 806, 810 (9th Cir. 1992) ("The court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo.").

IV.     <u>ANALYSIS.</u>

     A.     The Impact of "Insider" Status On The Avoidance Of <u>Preferential Transfers.</u>

A "preferential transfer" is a transfer of assets by an insolvent debtor to or for the benefit of a creditor before the debtor files for bankruptcy. 11 U.S.C. § 547(b). That is, the debtor "prefers" one creditor over another by allowing that creditor to receive more than that creditor would receive through the bankruptcy process. In the interest of consistent treatment of creditors, 11 U.S.C. § 547(b) permits a bankruptcy trustee to avoid or set aside preferential transfers made within a specified period of time before the debtor files a bankruptcy petition, provided five conditions are satisfied. <u>See</u> H.R. Rpt. No. 95-595, at 373, <u>as reprinted in</u> 1978 U.S.C.C.A.N. 5787, 6328-29 ("Subsection (b) is the operative provision of the section. It authorizes the trustee to avoid a transfer if five conditions are met. These are the five elements of a preference action." (quoted in <u>In re R & T Roofing Structures & Commercial Framing, Inc.</u>, 887 F.2d 981, 986 (9th Cir. 1989))). Specifically, § 547(b) provides, in relevant part, that

> (b) . . . the trustee may avoid any transfer of an interest of the debtor in property-
>> (1) to or for the benefit of a creditor;
>> (2) for or on an account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made -
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables such creditor to receive more than such creditor would receive if -
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The trustee has the burden of proving the five elements, including the fourth element, which covers creditors who were insiders at the time of a transfer. 11 U.S.C. § 547(g) ("the trustee has the burden of proving the avoidability of a transfer under subsection (b)"); see In re Tankersley (Seitter v. Wedow), 382 B.R. 522, 524 (Bankr. D. Kan. 2008) ("The Trustee must prove all these elements [in § 547(b)] by the preponderance of the evidence.").

As noted in § 547(b)(4), the "reach-back" period for a normal transfer is 90 days. However, when the transfer involves an "insider," that period is extended to a year before the bankruptcy filing. 11 U.S.C. § 547(b)(4); In re Enter. Acquisition Partners, Inc. (Miller Ave. Prof'l Svcs., Inc. v. Brady), 319 B.R. 626, 630-31 (B.A.P. 9th Cir. 2004) ("A trustee can avoid a transfer of an interest in a debtor's property if the transfer meets certain requirements, including that the transfer occurred within the requisite pre-bankruptcy period. . . . [When the transfer] occurred more than 90 days but less than one year before bankruptcy, it is avoidable under § 547 only if [the creditor] was an insider."). The rationale behind "extending the period of vulnerability of these transfers lies in the potential ability of the insider to control the debtor's conduct and to manipulate the timing of a bankruptcy petition." William Norton, Jr. et al., Norton Bankruptcy Law & Practice § 66:39 (3d ed. 2008). Here, the transfers of $371,500 and a mineral collection occurred more than 90 days before Lull filed his bankruptcy position. The Trustee must therefore prove that Brennan is an insider if he is to recover those assets.

For the purposes of § 547(b)(4), there are two types of insiders: (1) per se insiders, also known as statutory insiders, and (2) nonstatutory insiders. In re Enter. Acquisition Partners, 319 B.R. at 629 ("Bankruptcy law recognizes two types

12

of insiders: those specifically identified in § 101(31), commonly referred to as 'per se' insiders, and those not so identified but who have a sufficiently close relationship with the debtor to be insiders, commonly referred to as 'non-statutory' insiders.").

A per se insider is an individual or entity identified in 11 U.S.C. § 101(31). The nonexclusive list provides, in relevant part:

> (31) The term "insider" includes-
> (A) if the debtor is an individual-
> (i) relative of the debtor or of a general partner of the debtor;
> (ii) partnership in which the debtor is a general partner;
> (iii) general partner of the debtor; or
> (iv) corporation of which the debtor is a director, officer, or person in control;
> (B) if the debtor is a corporation-
> (i) director of the debtor;
> (ii) officer of the debtor;
> (iii) person in control of the debtor;
> (iv) partnership in which the debtor is a general partner;
> (v) general partner of the debtor; or
> (vi) relative of a general partner, director, officer, or person in control of the debtor;
> (C) if the debtor is a partnership-
> (i) general partner in the debtor;
> (ii) relative of a general partner in, general partner of, or person in control of the debtor;
> (iii) partnership in which the debtor is a general partner;
> (iv) general partner of the debtor; or
> (v) person in control of the debtor;

13

. . .
                    (E)  affiliate, or insider of an
                    affiliate as if such affiliate were the
                    debtor[.]

11 U.S.C. § 101(31).

        With respect to a per se insider, at least one

court, construing Supreme Court cases on statutory

construction, has strictly construed the statutory

definitions:

                    Particularly in light of the conclusive
                    presumption of preferential treatment that
                    arises from a determination that an entity is
                    a per se insider, there is no justification
                    for expanding the definition of per se
                    insider beyond what is plainly contained in
                    the statute.  To do so would result in adding
                    language to the statute that is not there,
                    which it is not within the province of the
                    court to do.  See Lamie, 540 U.S. at 537, 124
                    S. Ct. at 1032.

In re Enter. Acquisition Partners, 319 B.R. at 632 (emphasis

added).  Under this reasoning, an entity that does not expressly

fall within the statutory definition is not a per se insider.

        There clearly may, however, be insiders other than the

per se insiders listed in 11 U.S.C. § 101(31): "the use of the

word 'includes' is indicative of Congress' intent not to limit

the classification of insiders to the statutory definition."  In

re Friedman, 126 B.R. at 69-70.  The second type of insider

status is generally "based on a professional or business

relationship with the debtor . . . where such relationship

compels the conclusion that the individual or entity has a

                              14

relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." Id. at 70.  Similarly, legislative history provides that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."  H.R. Rep. No. 95-595, as reprinted in 1978 U.S.C.C.A.N. 5787, 6269.  However, because the Trustee does not argue that Brennan is a nonstatutory insider, the court need not consider whether Brennan fits into this second category.

As noted in § 101(31)(E), an affiliate is a type of insider.  Section 101(2) defines affiliate, in relevant part, as follows:

> The term "affiliate" means—
> (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
> (i) in a fiduciary or agent capacity without sole discretionary power to vote such securities; or
> (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
> (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an

15

```
                    entity that holds such securities-
                         (i) in a fiduciary or agency
                         capacity without sole discretionary
                         power to vote such securities; or
                         (ii) solely to secure a debt, if
                         such entity has not in fact
                         exercised such power to vote.
```

11 U.S.C. § 101(2)(A)-(B). Although affiliate status is

frequently litigated, there are few decisions examining in detail

the nuances of affiliate status. In <u>In re Reichmann Petroleum</u>

<u>Corporation</u>, 364 B.R. 916 (Bankr. E.D. Tex. 2007), the United

States District Court for the Eastern District of Texas described

forms of affiliate status:

> [T]he Code establishes three basic
> organizational structures under which related
> entities shall be considered as "affiliates."
> The first, addressed in subparagraph (2)(A),
> sets forth the circumstances under which a
> debtor's parent (or parent-like) entity will
> be considered an affiliate of the
> debtor. . . . The second and third
> structures creating an affiliate relationship
> under the Code are addressed by the
> alternative clauses of § 101(2)(B). The
> second structure reflects a vertical
> relationship between a debtor and a
> subsidiary (or subsidiary-like) entity. The
> third structure reflects a horizontal
> relationship between a debtor and another
> entity which share a common parent (or
> parent-like) entity, which accordingly
> justifies treating the debtor and its
> "sibling" entity as affiliates.

<u>Id.</u> at 920. Under the reasoning in that case, if Brennan is

sufficiently affiliated with entities that are in turn

sufficiently affiliated with Lull, then Brennan is additionally

an insider of Lull's.

B.    The Trustee Failed To Meet His Burden Of
Establishing Brennan's Insider Status.

Essential to the Bankruptcy Court's "insider chain" is
its determination that Brennan was an insider/affiliate with
respect to K382 LLC.  Brennan could not be an insider with
respect to Lull without first being an insider with respect to
K382 LLC.

As a preliminary matter, this court finds no clear
error in the Bankruptcy Court's finding that Brennan was indeed a
member of K382 LLC.  Brennan himself stated, "I considered myself
a member of K382" and in a different statement admitted to having
been "a member of K382."  Although Brennan argues that he never
actually received his membership interests and that KLL was the
sole member of K382 LLC, he does not dispute having paid for 15
Membership Interests with his wife.  See Appellant's Opening Br.
at 17-18, ECF No. 5.  Given the language of the Subscription
Agreement and the representations made by Brennan, the Bankruptcy
Court did not clearly err in finding that Brennan was a member of
K382 LLC.

Where this court does find error is in the Bankruptcy
Court's conclusion that, as a matter of law, Brennan had direct
or indirect ownership or control of 25 percent of K382 LLC's
Membership Interests, rendering him a K382 LLC affiliate under
the statutory requirement that he own, control, or hold with
power to vote 20 percent or more of all voting shares.  In this

17

court's view, the record does not support that conclusion.

The Bankruptcy Court concluded that, by jointly owning 25 percent of K382 LLC's voting securities with his wife, Brennan necessarily qualified as an affiliate under 11 U.S.C. § 101(2). But that statute requires an affiliate to have a specific kind of ownership or control. It defines an affiliate as one who "owns, controls, or holds <u>with power to vote</u>, 20 percent or more of the outstanding voting securities of the debtor." (Emphasis added.) "With power to vote" are words that are key to this case. At the hearing before this court, the Trustee stated that he read the words "with the power to vote" as modifying not just "holds" (the verb closest to "with power to vote"), but also "owns" and "controls." Given the lack of evidence on the nature of Brennan's ownership, the court cannot say that Brennan's power to vote 20 percent or more of K382 LLC's voting shares has been established.

The nature of the Brennans' ownership of their shares dictates what rights each had to control, own, or hold the shares. It is therefore imperative that the nature of ownership be determined. Yet it is this very ownership nature that the Bankruptcy Court concluded did not need to be determined:

> Defendant argues that he owned only
> 12 ½% of K382 LLC, so he was not an affiliate
> of that entity. However, in the absence of
> better or contrary proof, the Conversion
> Agreement, signed by both Defendant and his
> wife, shows that they were joint owners of

18

the membership interests of K382 at the time
of the preferences. Joint ownership means
that Defendant had direct or indirect
ownership or control of 25% of the membership
interests. It is unnecessary to attempt to
define the precise form of ownership, such as
joint tenants, tenants in common, or tenants
by the entirety.

Findings of Fact and Conclusions of Law 8, ECF No. 65.

In concluding that Brennan and his wife were "joint
owners of the membership interests in K382," the Bankruptcy Court
cited only what it called the Conversion Agreement. This is the
document with the simple title "Agreement" that this court
earlier identified as one of two critical documents. This
document referred to "the members of Kapaa 382" as including
"William F. Brennan and Judith E. Brennan jointly." It also
stated, as noted earlier in this order, that "William F. Brennan
and Judith E. Brennan are Class B members of Kapaa 382 and
presently jointly own fifteen (15) Class B shares in Kapaa 382."
Agreement (Aug. 30, 2006), Adv. No. 10-90084, ECF. No. 60
(emphasis added).

While the Agreement was signed by William and Judith
Brennan, its purpose was not to create a joint tenancy in the
Membership Interests. The Agreement set forth the resolution of
a dispute between the Brennans and K382 LLC. That resolution
converted what had been the Brennans' shares into a secured loan.
It did not announce what respective rights or interests Brennan
had in anything vis-à-vis his wife. In short, the Agreement was

19

not a document that could be relied on as setting forth the manner in which Brennan held his interest.

In evaluating the effect of the Agreement on Brennan's ownership, this court is greatly guided by the Hawaii Supreme Court's decision in In re Ikuta, 64 Haw. 236, 243, 639 P.2d 400, 405 (1981). That case involved a dispute between a man's first wife (and their children) and the man's second wife (and their child) over real property that at one time the man and his first wife had owned. At the time they acquired the property, the man and his first wife obtained a deed granting the property to them, "husband and wife as aforesaid, as tenants by the entirety." Id. at 239, 639 P.2d at 403. Subsequently, they signed a property management agreement, which stated in part: "WHEREAS, the First [Shunji] and Second [Chiyoko] Parties have joint tenancy property located at Wailupe, Oahu, Territory of Hawaii . . . ." Id. at 240, 639 P.2d at 403 (brackets in original). Their divorce decree also referred to the property as "the separate property of plaintiff and defendant, Dr. Shunji K. Ikuta, and held by them as joint tenants(.)" Id. Upon the husband's death, the probate court held that he and his first wife had held the property as tenants by the entirety until their divorce, at which time they became tenants in common. Id. On appeal, the first wife argued that the property management agreement made it clear that the property was owned in joint tenancy with right of survivorship.

Applying section 509-2 of Hawaii Revised Statutes, the Hawaii Supreme Court stated that "if the property management agreement of 1948 were an instrument of conveyance the tenor of which manifestly indicated an intention to create a joint tenancy, then . . . the property was held in joint tenancy after the Ikutas' divorce." Id. at 243, 639 P.2d at 405. However, the court held that the property management agreement was not an instrument of conveyance. While it referred to joint tenancy, it did not purport to create a new tenancy or alter a preexisting tenancy. It was therefore insufficient to change the form of ownership: "a property management agreement only conveys a right of management, and a right of management does not convey any property rights . . ., nor does it alter title to the property." Id. at 243, 639 P.2d 405. "[B]ecause the substance of the contract did not purport to settle property rights as between the parties, it must be found that the contract did not change title to the Wailupe property." Id.

Similarly, in this case, the Agreement signed in 2006 neither creates nor alters the tenancy by which the Brennans held Membership Interests in K382 LLC. The shares were purchased via the Subscription Agreement, which is silent as to the form of tenancy. Although clearly not subject to all the laws governing real property transactions, the purchase of the Membership Interests via the Subscription Agreement is analogous to the

purchase of the real property in In re Ikuta via a deed. Like the property management agreement in In re Ikuta, the Agreement in the present case referred to property that was "jointly owned," but did not purport to create or alter any tenancy. The 2006 Agreement therefore is insufficient to establish the manner in which Brennan and his wife held their shares.

This court is cognizant that the Bankruptcy Court relied on the Agreement only because there was nothing else in the record indicating how Brennan and his wife held their interests. Thus, the Bankruptcy Court said in its findings that it was referring to the Agreement "in the absence of better or contrary proof."[2] But if, under Hawaii law (which both parties agree controls the tenancy issue), the Agreement did not create or alter a tenancy, then the Agreement is tantamount to no proof at all of how the Brennans held their interests.

---

[2] The Bankruptcy Court understandably did not cite William Hancock's statement in his declaration that the Brennans' "jointly owned" 15 shares in K382 LLC. Although Hancock claimed to be making his declaration based on his "own personal knowledge," nothing in the record indicates the basis of that personal knowledge. In short, the mere incantation of the words "personal knowledge" does not mean that a declaration satisfies the requirement in Rule 56 of the Federal Rules of Civil Procedure that it be made on "personal knowledge." It is, in fact, implausible that Hancock would have known how the Brennans held their interests unless they communicated that to him, and there is no evidence that that occurred. To the contrary, Brennan's own silence in that regard suggests that that did not occur. If Hancock is simply interpreting the Subscription Agreement in asserting the Brennans' joint ownership, then he is not attesting to any fact a court should rely on.

22

Nor does the record establish that the Brennans' signatures on the Agreement were intended to indicate that the Brennans were confirming a preexisting tenancy. The purpose of the Agreement was to set forth the terms by which the Brennans would be repaid by K382 LLC. Nothing in the Agreement or elsewhere in the record indicates that the Brennans intended by signing the document to confirm how, as between William Brennan and Judith Brennan, their interests were held. Nothing in the record suggests that they did pay or should have paid attention to the effect of a reference to them as "joint owners," or that they knew or should have known that such a reference could affect their rights in contexts other than those covered by the Agreement. Moreover, "joint owners" is a term that lacks the specificity of terms like "tenants by the entirety," "joint tenants," and "tenants in common." It is not at all clear that "joint owners" was used to denote a particular one of those three possible tenancies. Given the lack of evidence indicating what any preexisting form of ownership was, or what the Brennans intended in signing a document referring to them as "joint owners," accepting the Agreement as memorializing a preexisting form of ownership would be equivalent to allowing the Agreement to create a tenancy. But allowing such a document to create a tenancy would run afoul of Hawaii law as articulated in <u>In re Ikuta</u>.

Admittedly, <u>In re Ikuta</u> concerned the question of whether a property management agreement could <u>change</u> title to real property, not whether a property management agreement could be said to <u>confirm</u> an existing form of ownership. Nevertheless, in saying that the property management agreement "neither conveyed property nor altered the tenancy by entirety," the Hawaii Supreme Court made it clear that, absent a conveyance, no tenancy was created. <u>See In re Ikuta</u>, 64 Haw. at 243, 639 P.2d at 405. Allowing the 2006 Agreement between the Brennans and K382 LLC to govern how the Brennans held their interests would be the same as treating the 2006 Agreement as a conveyance by the Brennans of their interests to themselves as joint owners. As the 2006 Agreement, far from documenting a conveyance of Membership Interests to the Brennans, involved the sale by the Brennans of their interests to K382 LLC, it makes little sense, in the absence of supporting evidence, to conclude on the basis of only the "joint owners" reference in the Agreement that the Brennans held their interests in a particular manner.

If the Agreement cannot be said to establish how the Brennans held the Membership Interests, that leaves the question of how to decide the question before the court. In the absence of sufficient evidence of how the Brennans held their interests, this court examines who bears the burden of establishing how the interests were held. If that party fails to carry its burden on

a matter essential to its position, then that party cannot prevail on the present record. Here, it is the Trustee who bears the burden of establishing, as a prerequisite to establishing Brennan's insider status, that Brennan owned, controlled, or held with power to vote, 20 percent of more of K382 LLC's outstanding voting securities. See 11 U.S.C. § 547(g). The Trustee has not, on the present record, carried this burden, and summary judgment therefore should not have been granted to him on this point.

In further proceedings in the Bankruptcy Court, the parties should focus on the nature of William Brennan's ownership. Whether Brennan and his wife owned the Membership Interests as joint tenants or as tenants in common will dictate what rights each had to own, control, or hold the shares with power to vote. Given the present state of the record, this court cannot see how Brennan could be said to own, control, or hold with power to vote, 20 percent or more of K382 LLC's outstanding voting securities if Brennan and his wife held their shares as tenants in common.

As the Bankruptcy Court recognized, all three tenancies are recognized in Hawaii. See Sawada v. Endo, 57 Haw. 608, 612, 561 P.2d 1291, 1294 (1977). As neither the Trustee nor Brennan argues on this appeal that the shares were held in tenancy by the entirety, the court does not here examine that possibility.

If Brennan and his wife held the shares as joint

tenants, each had an undivided interest in the shares: a "joint tenant has a specific, albeit undivided, interest in the property, and if he survives his cotenant he becomes the owner of a larger interest than he had prior to the death of the other joint tenant." Sawada, 57 Haw. at 613, 561 P.2d at 1295 (emphasis added). "The distinguishing feature of joint tenancy is that each has the whole and every part . . . ." Thurston v. Allen, 8 Haw. 392, 396 (1892). See generally Traders Travel Int'l, Inc. v. Howser, 69 Haw. 609, 613, 753 P.2d 244, 246 (1988) (concluding that a debtor held a bank account as a joint tenant, the court said that "the debtor presumably holds the entire joint bank account but may disprove this supposition to establish his or her actual equitable interest").

Alternatively, if Brennan and his wife held their shares as tenants in common, they held "proportionately according to their respective shares." Guray v. Tacras, 119 Haw. 212, 194 P.3d 1174 (Haw. Ct. App. 2008) (quoting Scott v. Pilipo, 24 Haw. 277, 282-83, 1918 WL 1211 (1918)). "Each tenant in common is equally entitled to the use, benefit, and possession of the common property, and may exercise acts of ownership in regard thereto, the limitation of his right being that he is bound to so exercise his rights in the property as not to interfere with the rights of his cotenant." Moranho v. De Aguiar, 25 Haw. 267, 270, 1919 WL 1333, at *2 (1919) (emphasis added), rev'd on other

grounds, 25 Haw. 271, 273 1920 WL 765 (1920).  See 86 C.J.S. Tenancy in Common § 1 (2011) ("A tenancy in common is generally defined as the holding of property by several persons by several and distinct titles, with unity of possession only.  Each tenant in common owns a separate fractional share of undivided property, and each cotenant's title is held independently of other cotenants."); Id. at § 19 ("Tenants in common may each unilaterally alienate their shares through sale or gift or place encumbrances upon their shares . . . and have the right to use the property, to exclude third parties from it, and to receive a portion of any income produced from it.").

In deeming the Brennans to be "joint owners," the Bankruptcy Court left undefined the contours of this joint ownership.  It appears to this court that the Bankruptcy Court was using the term "joint owners" as a generic reference to multiple owners and was implicitly concluding that whenever there are multiple owners, each owner owns, controls, or holds the entire property.  This court reads Hawaii law as providing that the rights of multiple owners differ in accordance with their tenancies.

In his Answering Brief, the Trustee assumes that the Brennans' joint ownership was a joint tenancy.  Citing the 1892 Hawaii case of Thurston v. Allen, the Trustee notes that each joint tenant "has the whole and every part" and "each is the

27

holder of the whole." Thurston, 8 Haw. at 396. Concluding that,
as a joint tenant, William Brennan owned, controlled, or held all
15 shares, the Trustee apparently assumes that he did so "with
power to vote" 20 percent or more of the voting shares. Nothing
in the record indicates whether Brennan actually did have the
power to vote all 15 shares or what effect Brennan's vote would
have had if his wife voted differently. Nor is there evidence
that Judith Brennan consented to William Brennan's voting of all
15 shares. While the Trustee reads the references in Hawaii case
law to a joint tenant's holding of "the whole" as including the
holding of the right to vote the whole, he cites neither legal
authority for this reading nor evidence that the Brennans had
even contemplated their respective voting rights. In Howser, the
Hawaii Supreme Court recognized only a presumption that a joint
tenant held an entire bank account. The Hawaii Supreme Court
said that the presumption could be overcome by proof of the joint
tenant's actual equitable interest. Howser, 69 Haw. at 613, 753
P.2d at 746. The Trustee appears to be arguing not just a
presumption, but an irrefutable right by a joint tenant to vote
all shares. This court has not found Hawaii law to that effect.

At the hearing before this court, referring to numerous
Hawaii cases cited in his filing in the Bankruptcy Court, the
Trustee argued that, even if the Brennans were tenants in common,
William Brennan owned, controlled, or held all 15 shares and had

28

the power to vote all 15. This court recognizes that, under Hawaii law, a tenant in common has a right to possess the entire property. See, e.g., Waimea Falls Park v. Brown, 6 Haw. App. 83, 90-91, 712 P.2d 1136, 1142 (1985). But a right to possess the whole is not necessarily equivalent to ownership, control, or holding of the whole with power to vote the whole. Hawaii law expressly states that a tenant in common has no right to interfere with a cotenant's rights. Moranho, 25 Haw. at 270. The Trustee cited neither law nor evidence indicating that, if Brennan and his wife were tenants in common, each could vote the other's interest, even absent the other's consent.

Whether the Brennans were joint tenants or tenants in common is not determinable purely as a matter of law. With respect to personal property, there is no presumption in Hawaii regarding the form of tenancy. At common law, real property was presumed to be held as tenants in common, unless specified otherwise. See Kupau v. Waiahole Water Co., Ltd., 37 Haw. 234 (1945); Magoon v. Chuck, 31 Haw. 661 (1930); Thurston, 8 Haw. 392. This principle was codified in section 509-1 of Hawaii Revised Statutes, which provides that, unless manifest from the conveyance documents, "[a]ll grants, conveyances, and devises of land, or of any interest therein, made to two or more persons, shall be construed to create estates in common and not in joint tenancy or by entirety." Haw. Rev. Stat. § 509-1 (1976). The

29

Hawaii Supreme Court has made it clear that the presumption
contained within section 509-1 is inapplicable to personal
property.  See In re Estate of Au, 59 Haw. 474, 477, 583 P.2d
966, 969 (1978) ("Not only does HRS § 509-1 on its face apply
solely to real property, but the legislative history of the
statute discloses that it concerned 'the ownership of real
property.'").  Likewise, section 509-2, although applicable to
personal property, does not state a preference or presumption in
favor of joint tenancy, tenancy by the entirety, or tenancy in
common.  See Haw. Rev. Stat. § 509-2 (1997); In re Estate of Au,
59 Haw. at 477, 583 P.2d at 969 ("As it presently reads, HRS
§ 509-2 states no presumption in favor of a tenancy in common.").
There being no presumption, a determination of the nature of the
Brennans' tenancy must start with evidence.

> C.    Given The Insufficient Proof That Brennan Owned,
>       Controlled, Or Held With Power To Vote More Than
>       20 Percent Of K382 LLC, This Court Need Not
>       Determine Whether He Would Qualify As An Insider
>       If He Had Such Ownership, Control, Or Holding.

The parties and the Bankruptcy Court spent admirable
effort on the issue of whether Brennan's links to Lull through
multiple entities qualified him to be an insider.  This court can
therefore understand that they will be disappointed that this
court is declining to address that issue.  This court's ruling on
that issue will become necessary only if, at the conclusion of
proceedings on remand, Brennan is determined to have owned,

controlled, or held with power to vote more than 20 percent of K382 LLC, and an appeal from that new determination is then taken. In the event there is no such determination on remand, however, any ruling by this court at this time on that issue will have been superfluous. In the interest of avoiding unnecessary rulings, this court does not address that issue.

There is, of course, a kind of "chicken or egg" quality about the issues before this court. If Brennan does not own more than 20 percent with power to vote, then the issue of how many affiliate layers are allowable in any insider chain is moot. If, on the other hand, one starts with the question of how many affiliate layers are allowable and determines that the number is lower than the number necessary to connect Brennan to Lull, then the issue of what Brennan owns is moot. Whichever issue one starts with, one might conceivably end up addressing issues unnecessarily.

While recognizing that it might promote economy for the parties and the Bankruptcy Court if this court did address the affiliate layer issue at this time, this court cannot help concluding that it is wiser for it to defer doing that. Clearly, there are competing policy issues involved that have been advanced by the parties. On the one hand, the Trustee argues that, as § 101 does not contain any cutoff point, an infinite number of affiliate layers must be permissible. Otherwise, the

Trustee points out, scam artists would always set up a sufficient number of layers to insulate their ill-gotten gains from recovery by a trustee. On the other hand, Brennan argues, allowing an infinite number of affiliate layers could lead to designating as an insider a person or entity with a highly attenuated relationship to the debtor. There is, unfortunately, no controlling case law directly on point. The parties and this court may certainly be forgiven for hoping that controlling law directly on point will become available before remand proceedings are concluded!

Because the present ruling places issues in a light different from those under which the Bankruptcy Court addressed the issue of whether Judith Brennan must be joined as a party, this court leaves it to the Bankruptcy Court to revisit that issue consistent with the present ruling.

V.        CONCLUSION.

The Bankruptcy Court's Order Concerning Cross-Motion for Summary Judgment and Final Judgment Against William F. Brennan are reversed on the ground that the Trustee has not met his burden of establishing that Brennan owns, controls, or holds with power to vote 20 percent or more of K382 LLC's outstanding voting securities. This case is remanded to the Bankruptcy Court for proceedings consistent with this ruling.

In the event a further appeal is taken to the district

court in this matter, that further appeal should be assigned to this district judge, not because this district judge harbors an enduring fascination with affiliate layers, but pursuant to Local Rule 40.2 concerning the assignment of similar cases.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 30, 2011.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

In re James William Lull, CIVIL NO. 11-00349 SOM/BMK; ORDER REVERSING BANKRUPTCY COURT'S PARTIAL SUMMARY JUDGMENT IN FAVOR OF TRUSTEE AND FINAL JUDGMENT IN FAVOR OF TRUSTEE, AND REMANDING CASE.